**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

THE UNITED STATES OF AMERICA )
*ex rel.* HEATHER JO NUMBERS  and )
GREGORY SCOTT DAVIS; )
THE STATE OF FLORIDA *ex rel.* )
HEATHER JO NUMBERS and )
GREGORY SCOTT DAVIS, )
)
     Plaintiffs, )
)
v. )  Case No: 8 10 CV 912-T 27
)  E AJ
)
HERNANDO-PASCO HOSPICE, INC. )
And HPH HEALTHCARE, LLC d/b/a )
HPH HOSPICE; GULFSIDE REGIONAL )
HOSPICE, INC.; JSA HEALTHCARE )
CORPORATION; BALDOMERO )
LOPEZ MEMORIAL VETERANS )     ~~FILED UNDER SEAL~~
NURSING HOME; BAYONET )  **DO NOT PLACE IN PRESS BOX**
POINT HEALTH & REHABILITATION )  **DO NOT ENTER ON PACER**
CENTER; BEAR CREEK NURSING )
CENTER, LLC; CONSULATE )     **DEMAND FOR JURY**
HEALTH CARE OF BAYONET POINT; )
CONSULATE HEALTH CARE OF )
NEW PORT RITCHEY; HEATHER HILL )
NURSING CENTER, LLC; LIFE CARE )
CENTER OF NEW PORT RITCHEY; )
MADISON POINTE REHABILITATION )
AND HEALTH CENTER, LLC; )
ORCHARD RIDGE CARE AND )
REHABILITATION CENTER; )
ROYAL OAK NURSING CENTER, LLC; )
SOUTHERN PINES HEALTHCARE )

54999

TD
$ 350

CENTER; TRINITY REGIONAL )
REHAB CENTER; WINDSOR WOODS )
REHABILITATION AND HEALTH )
CARE CENTER; BROOKSVILLE )
HEALTHCARE CENTER, LLC; )
HEARTLAND OF BROOKSVILLE; )
ZEPHYRHILLS HEALTH & REHAB )
CENTER; HERON POINTE HEALTH )
AND REHABILITATION; EMERITUS )
AT LA CASA GRANDE; EMERITUS )
AT NEW PORT RITCHEY; )
NEW PORT RITCHEY; OAKVIEW )
TERRACE; ZEPHYR HAVEN HEALTH )
& REHAB CENTER; SUNSET BAY )
ASSISTED LIVING; HEARTLAND )
OF ZEPHRYHILLS FLORIDA, LLC; )
THE EDWINOLA; HERITAGE PARK; )
SUNSHINE CHRISTIAN HOMES, INC.; )
COMMUNITY HOSPITAL )
VOLUNTEERS, INC.; MORTON )
PLANT MEASE HEALTH CARE, INC.; )
WESTBROOK MANOR; )
REGIONAL MEDICAL CENTER; )
BAYONET POINT VOLUNTEERS )
ASSOCIATION, INC.; HEALTH )
MANAGEMENT ASSOCIATES; )
OAK HILL HOSPITAL VOLUNTEER )
ASSOCIATION, INC.; CITRUS )
MEMORIAL HOSPITAL; ALL )
CHILDREN'S HOSPITAL, INC.; )
HELEN ELLIS MEMORIAL )
HOSPITAL FOUNDATION, INC.; )
 H. LEE MOFFIT CANCER CENTER & )
RESEARCH INSTITUTE HOSPITAL; )
KINDRED HEALTHCARE; and )

**FILED UNDER SEAL**
**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

**DEMAND FOR JURY**

2

UNIVERSITY COMMUNITY           )
HOSPITAL, INC.,                )
                               )
    Defendants.              )

## *QUI TAM* COMPLAINT

Plaintiff-Relators Heather Jo Numbers and Gregory Scott Davis, on behalf of themselves, the United States of America, and the State of Florida, allege and claim against Defendants as follows:

## JURISDICTION AND VENUE

1.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized over both the federal and state law claims under 31 U.S.C. § 3732(a).

2.    Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Florida, transact substantial business in the State of Florida, transact substantial business in this judicial District, and can be found there. Additionally, as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendants submitted in this judicial district false claims for ineligible hospice patients and for hospice care that was never actually provided; submitted, caused to be submitted, and conspired to submit false claims for

patients referred in exchange for illegal kickbacks; and submitted false records to get such claims paid.

## PARTIES

3.      Defendant Hernando-Pasco Hospice, Inc., doing business as HPH Hospice (HPH), is a Florida-based, Medicare-certified healthcare provider. Founded in 1984, HPH offers hospice, home health care, skilled nursing, and pharmacy services to over 1,000 patients daily.    Upon information and belief, HPH owns, operates, and conducts some of its activities through Defendant HPH Healthcare, LLC.

4.      Defendant Gulfside Regional Hospice, Inc. (Gulfside) is a Medicare-certified hospice provider exclusively serving Pasco County, Florida since 1988. (The Defendants identified in Paragraphs No. 4 and 5 will be collectively referred to as the Hospice Defendants).

5.      Defendant JSA HealthCare Corporation (JSA) is a Florida-based healthcare provider offering primary care and pharmacy services to thousands of patients through a network of wholly-owned and affiliated physician groups.

6.      Upon information and belief Defendant Baldomero Lopez Memorial Veterans Nursing Home operates a skilled nursing facility in Pasco County, Florida; Upon information and belief Defendant Bayonet Point Health & Rehabilitation Center operates a skilled nursing facility in Pasco County, Florida;

Defendant Bear Creek Nursing Center, LLC operates a skilled nursing facility known as Bear Creek Nursing Center in Pasco County, Florida; Upon information and belief Defendant Consulate Health Care of Bayonet Point operates a skilled nursing facility in Pasco County, Florida; Upon information and belief Defendant Consulate Health Care of New Port Ritchey operates a skilled nursing facility in Pasco County, Florida; Defendant Heather Hill Nursing Center, LLC operates a skilled nursing facility known as Heather Hill Healthcare Center in New Port Ritchey, Florida; Upon information and belief Defendant Life Care Center of New Port Ritchey operates a skilled nursing facility in Pasco County, Florida; Defendant Madison Pointe Rehabilitation and Health Center, LLC operates a skilled nursing facility known as Madison Pointe Rehabilitation and Health Center in Pasco County, Florida; Upon information and belief Defendant Orchard Ridge Care and Rehabilitation Center operates a skilled nursing facility in Pasco County, Florida; Defendant Royal Oak Nursing Center, LLC operates a skilled nursing facility known as Royal Oak Nursing Center in Pasco County, Florida; Upon information and belief Defendant Southern Pines Healthcare Center operates a skilled nursing facility in Pasco County, Florida; Upon information and belief Defendant Trinity Regional Rehab Center operates a skilled nursing facility in Pasco County, Florida; Upon information and belief Defendant Windsor Woods Rehabilitation and Healthcare Center operates a skilled nursing facility in Pasco

County, Florida; Defendant Brooksville Healthcare Center, LLC operates a skilled nursing facility known as Brooksville Healthcare Center in Hernando County, Florida; Upon information and belief Defendant Heartland of Brooksville operates a skilled nursing facility in Hernando County, Florida; Upon information and belief Defendant Heron Pointe Health and Rehabilitation operates a skilled nursing facility in Hernando County, Florida; Upon information and belief Defendant Zephyrhills Health and Rehab Center operates a skilled nursing facility in Pasco County, Florida; Upon information and belief Heritage Park operates a skilled nursing facility in Pasco County, Florida (the Defendants identified in Paragraph No. 6 will be collectively referred to as the Skilled Nursing Facility (SNF) Defendants).

7.     Upon information and belief Defendant Emeritus at La Casa Grande operates an assisted living facility in Pasco County, Florida; Upon information and belief Defendant Emeritus at New Port Ritchey operates an assisted living facility in Pasco County, Florida; Upon information and belief Defendant Oakview Terrace operates an assisted living facility in Pasco County, Florida; Defendant Sunshine Christian Homes, Inc. operates an assisted living facility in Pasco County, Florida; Upon information and belief Zephyr Haven Health & Rehab Center operates an assisted living facility in Pasco County, Florida; Upon information and belief Sunset Bay Assisted Living operates an assisted living

facility in Pasco County, Florida; Heartland of Zephyrhills Florida, LLC operates an assisted living facility known as Heartland of Zephyrhills in Pasco County, Florida; Upon information and belief The Edwinola operates an assisted living facility in Pasco County, Florida; Upon information and belief Westbrook Manor operates an assisted living facility in Zephyrhills, Florida (the Defendants identified in Paragraph No. 7 will be collectively referred to as the Assisted Living Facility (ALF) Defendants).

8.      Defendant Community Hospital Volunteers, Inc. operates an acute care hospital known as Community Hospital in Pasco County, Florida; Defendant Regional Medical Center Bayonet Point Volunteers Association, Inc. operates an acute care hospital known as Regional Medical Center Bayonet Point in Pasco County; Defendant Health Management Associates owns and operates acute care hospitals across the country, including Brooksville Regional Hospital, Springhill Regional Hospital, and Seven Rivers Regional Hospital; Defendant Oak Hill Hospital Volunteer Association Inc. operates an acute care hospital known as Oak Hill Hospital in Hernando County, Florida; Upon information and belief Defendant Citrus Memorial Hospital operates an acute care hospital in Citrus County, Florida; Defendant All Children's Hospital, Inc. operates an acute care hospital in Pinellas County, Florida; Defendant Helen Ellis Memorial Hospital Foundation, Inc. operates an acute care hospital known as Helen Ellis Memorial Hospital in Pinellas

County, Florida; Defendant Morton Plant Mease Health Care, Inc. owns and operates acute care hospitals known as Mease Countryside Hospital in Pinellas County, Florida and Morton Plant North Bay Hospital in Pasco County, Florida; Upon information and belief Defendant H. Lee Moffitt Cancer Center & Research Institute Hospital operates an acute care hospital in Hillsborough County, Florida; Defendant Kindred Healthcare operates an acute care hospital known as Kindred Hospital – Bay Area Tampa in Hillsborough County, Florida; University Community Hospital, Inc. operates a hospital known as University Community Hospital in Hillsborough County, Florida (the Defendants identified in Paragraph No. 8 will be collectively referred to as the Hospital Defendants).

9.     Plaintiff-Relator Heather Jo Numbers is a long-time hospice social worker and manager.   Ms. Numbers began employment with HPH as a social worker in 1996.   Since 2007 she has acted as an HPH clinical manager.   In the course of her duties, Ms. Numbers has become aware that several of HPH's long-standing business practices are designed to defraud the United States and the State of Florida.   Ms. Numbers has direct personal knowledge that HPH fraudulently induces referrals through illegal kickbacks, fraudulently recruits and bills for hospice services to ineligible patients, and fraudulently conceals its schemes and evades its obligations to the United States and the State of Florida by falsely discharging and readmitting patients regardless of qualification.   Through her long

8

personal experience at HPH, Ms. Numbers has learned that JSA, the SNF Defendants, the ALF Defendants, and the Hospital Defendants each accept illicit in-kind bribes from HPH in exchange for referring Medicare hospice patients to HPH. Ms. Numbers also has direct personal knowledge that Defendant Gulfside offers illicit in-kind bribes to some of the SNF Defendants in exchange for Medicare referrals. Ms. Numbers was terminated by HPH in December 2009 after reporting these violations.

10.  Plaintiff-Relator Gregory Scott Davis has worked as a social worker, social work manager, and clinical manager at HPH for 19 years. Over the long course of his employment, Mr. Davis has become thoroughly familiar with HPH's practices of recertifying and billing for non-qualifying patients, fraudulently revoking and readmitting patients using false consent forms, and providing illicit remuneration – in the form of free nursing and pain management services – to JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants in exchange for referrals.

11.  Defendants' fraudulent practices offend Plaintiff-Relators' long-standing dedication to the mission of hospice care and induce them to file this Complaint on behalf of themselves, the United States, and the State of Florida as original-source relators under *the qui tam* provisions of the False Claims Act and the Florida False Claims Act, FLA. STAT. 68.083. Plaintiff-Relators are

9

concurrently serving on the United States and the State of Florida a written disclosure of the material evidence and information upon which this claim is based.

## THE LAW

### I.    The Anti-Kickback Statute

12.    The Medicare and Medicaid Patient Protection Act of 1987, as amended and codified at 42 U.S.C. §1320a-7b (the "Anti-kickback Statute"), provides as follows:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

13.    Florida law provides that "[a] person may not . . .

> [k]nowingly solicit, offer, pay, or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be

made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

FLA. STAT. 409.920(2)(a)(the Florida Anti-Kickback Statute).

## II.   The Medicare Hospice Benefit

14.   Defendants' aggressive business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.   The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally-ill.   In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminally-ill patients.   Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."   In 1982, Congress created a provisional Medicare Hospice Benefit ("Hospice"), made permanent in 1986.   By 1990, 800 Hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

15.    From such humble altruistic roots, Hospice has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the Hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." On January 9, 2009 the Medicare Payment Advisory Commission issued a statement and set of recommendations addressing Medicare's ballooning liabilities under Hospice. The Commission concluded that the Hospice system "embodies incentives that may undermine" Medicare's goals.

16.    Leslie Novak, then Acting Director of CMS, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home." Nevertheless, Defendants and other Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general care to elderly and chronically-ill patients and to illegally and fraudulently shift costs to boost their own profits while increasing the burden on the Medicare system. One manner in which this is being accomplished is through collusion between hospices and nursing homes or skilled nursing facilities (SNFs).

17.   Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician.   Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.   Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness.   Qualified beneficiaries who elect Hospice agree to forego curative treatment for their terminal condition.

18.   Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses Hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled.   Medicare and/or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule that has four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), inpatient respite care (IRC), and general inpatient care (GIC).

19.   The four categories are distinguished by the location and intensity of the services provided and the base payments for each category reflect variation in expected input cost differences.  Specifically, patients who are eligible for IRC and GIC Hospice care qualify not only for Medicare reimbursement of inpatient Hospice services, but also for federally-funded reimbursement for room and board costs at nursing homes and certain other in-patient facilities.  In such instances, the patient may receive goods and services from the Hospice provider that offset the costs to the nursing home of otherwise duplicative goods and services.  If a patient does not qualify for IRC or GIC Hospice care but only qualifies for RHC or CHC, then she may nevertheless receive Hospice care while in a nursing home. However, the nursing home will not receive Medicare reimbursement for nursing home care.  In any event, in order for a patient to receive Hospice care in a nursing home, the nursing home must have a contract with a Medicare-certified Hospice provider.

20.   Unless a Hospice company provides CHC, IRC, or GIC on any given day it is paid at the RHC rate.  For any given patient, the type of care can vary throughout the Hospice stay as the patient's needs change. The daily payment rates are intended to cover costs that Hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering a terminal illness.

### III.   Medicare Coverage of Skilled Nursing Care

21.   Medicare offers limited coverage of skilled nursing care for qualifying patients. *See* 42 U.S.C. § 1495i.   In order to qualify for coverage, a patient otherwise appropriate for Medicare must show a qualifying hospital stay of three or more days within the 30 days prior to entering the skilled nursing facility.   A physician must order procedures for the patient that are appropriate to be performed only in a Skilled Nursing Facility (SNF), such as rehabilitative therapy, and must certify that the patient's condition is such that he or she can practically be cared for only in a SNF.   In so certifying, the physician must determine that the patient's condition should improve or achieve stability in response to curative care. The SNF medical staff is required to write a plan of care for each skilled nursing patient based upon the individual's needs and circumstances.   Upon satisfaction of those requirements, Medicare will pay for up to 100 days of skilled nursing care per-patient per-illness period – though after the first 20 days a co-payment of 20% is required of the patient.   Once a patient qualifies, Medicare bears all expenses of the skilled nursing facility, including the patient's custodial care and room and board (custodial care is not otherwise covered by Medicare).   Typically, a SNF receives approximately $650 per day from Medicare for a qualifying skilled nursing patient.

22.   The Office of Inspector General, Department of Health and Human Services (OIG) has identified the potential for fraud inherent in the nursing home-hospice relationship.  Frequently, Hospice patients will receive Hospice care while residing in a nursing home.  Naturally, SNFs and assisted living facilities represent large pools of potential Hospice patients and constitute a valuable referral source for hospices.  In a March 1998, Special Fraud Alert, OIG delineated suspected fraudulent practices, including:

> A hospice providing free (or below fair market value) care to nursing home patients, for whom the nursing home is receiving Medicare payment under the skilled nursing facility benefit, with the expectation that after the patient exhausts the skilled nursing facility benefit, the patient will receive hospice services from that hospice.[1]

The OIG's concern is well-founded.  A 2009 OIG audit of Medicare claims for hospice patients living in nursing homes found that a staggering 82% of such claims failed to meet Medicare requirements.[2]

## DEFENDANTS' FRAUDULENT SCHEMES

### (a)   Defendant HPH's Fraudulent Certification and Re-Certification of Non-Terminal Patients for Hospice.

23.   Since at least 1996, Defendant HPH has defrauded the United States through a systematic pattern and practice of enrolling and re-certifying non-terminal patients for Hospice.

---

[1] *See* OIG SPECIAL FRAUD ALERT: *Fraud and Abuse in Nursing Home Arrangements with Hospices*, available at: http://oig.hhs.gov/fraud/docs/alertsandbulletins/hospice.pdf

[2] *See* OIG MEMORANDUM REPORT: *Medicare Hospice Care: Services Provided to Beneficiaries Residing in Nursing Homes*, available at: http://oig.hhs.gov/oei/reports/oei-02-06-00223.pdf

24.    With the goal of boosting profits, HPH has deliberately implemented policies designed to result in the enrollment and recertification of patients who are not terminal and do not qualify for Hospice. HPH expressly instructs personnel to admit and bill for patients who are ineligible for Hospice and to refrain from discharging patients who were either never eligible or who have become ineligible as their conditions have stabilized.

25.    At a management meeting in or around March, 2010, Director of Marketing Sue Versley (Versley) instructed all staff that every patient referred to HPH is to be admitted, regardless of qualification. When some personnel protested that not every patient meets Medicare and Medicaid eligibility requirements for Hospice, Versley confirmed that every patient was to be admitted for at least 30 days – period. HPH Regional Manager for West Pasco, Kate Brusik (Brusik), routinely instructs staff with the mantra: "one hospice order equals one hospice admission" – in other words, patients are to be admitted whether Medicare-mandated assessments by HPH personnel find them to be eligible for Hospice or not. Likewise, Brusik has recently instructed clinical managers that patients who plan to undergo aggressive curative treatment – and thus cannot legitimately elect the Hospice benefit – should be admitted until they actually begin treatments, then "revoked."

26.   Similarly, HPH management often instructs personnel not to discharge patients even when those patients appear to be stable rather than terminal; in Plaintiff-Relators' experience, whenever HPH's census is low, the mandate is handed down that no patients are to be discharged.   In or around December, 2009, for example, Brusik instructed nursing and clinical staff not to discharge any patients due to HPH's census.

27.   Furthermore, under the guise of protecting patients, Brusik and East Pasco Regional Manager Dawn Woodward habitually instruct all staff never to discharge any patients during "cold and flu season" – *i.e.*, November through February – even if the patients are stable and do not qualify for Hospice. Regardless of the motive, this practice results in ineligible patients remaining on HPH's rolls – and being billed to the United States and the state of Florida through Medicare and Medicaid – for weeks or months after they should have been discharged.   In fact, HPH's practice creates the real danger that stabilized patients in need of curative care will be denied curative treatment merely because their re-certification period falls between November and February.

28.   HPH promotes and conceals its fraud through a device it has termed a "break in billing."   Through wholesale fabrication of patient election and revocation documents, HPH creates the false appearance that patients have revoked the Hospice benefit then been readmitted.   At the time of admission, staff are

instructed to fraudulently obtain signed, blank election and revocation forms from each patient.   These forms are kept on file at the desk of each social work supervisor – separate from the patients' actual files – until they are needed.   When a "break in billing" is necessary – that is, when and ineligible patient has remained on the rolls far too long – the false paperwork is falsely dated and filed and the patient is fraudulently "revoked" for a period, then readmitted.   In or around October, 2009, HPH Risk Manager Debbie Cutcliffe (Cutcliffe) called Plaintiff-Relator Numbers to ask if Ms. Numbers' office had a blank consent form signed by a certain patient;   Cutcliffe explained that the form would be fraudulently dated and used to replace one that was found missing during a chart audit.   Over the course of their duties, Plaintiff-Relators have witnessed countless incidents in which HPH has used counterfeit paperwork to fraudulently revoke, then readmit, patients who did not qualify for Hospice care, all with the goal of evading detection and getting future false claims paid.    For example, patient C.G. was originally admitted to HPH's hospice rolls in or around March, 2000.  C.G. was discharged and readmitted with no legitimate basis at least twice before finally dying in or around August, 2008 – six years later.

29.     HPH also conceals its fraud by fraudulently altering patient diagnoses and by recording non-existent declines in patient condition – a practice known as "negative charting."   Plaintiff-Relators are familiar with numerous instances in

which patients referred to HPH did not meet the Hospice criteria and Local Coverage Determinations for that diagnosis. In each instance, HPH management – often in the person of Brusik – instructed nursing and clinical staff to simply admit such patients under a general diagnosis such as debility. Additionally, Plaintiff-Relators and HPH's other staff were consistently instructed by Brusik and others to perform negative charting in order to create the false appearance that a stable patient was in a state of decline.

30.    Through its fraudulent schemes, HPH successfully bills the United States and the State of Florida for non-qualifying patients for many years. The following are examples of specific patients who have been inappropriately billed for Hospice care:

(a)    Patient B.H. remained on HPH's roll for at least five years, from approximately 2002-2008. Admitted under a diagnosis of COPD, B.H. did not meet the Hospice criteria or Local Coverage Determinations for a terminal, "end-stage" COPD diagnosis, and was eventually discharged alive.

(b)    Patient S.Z. was improperly billed to Medicare, Medicaid, or both for at least five years, from approximately 2004 to 2009. 54 years old, S.Z. was admitted under a cardiac diagnosis, but was not terminal and was eventually discharged alive.

(c)     Patient N.D. was admitted in or around 2000, under a diagnosis of dementia, but did not meet Hospice criteria or Local Coverage Determinations for terminal dementia and remained on HPH rolls until around April, 2006.

(d)     Patient L.O. has been on HPH's rolls for some six years on a diagnosis of dementia and is still on service at the time of this filing.

31.     The above examples are typical results of HPH's fraudulent practices. In light of their experience, Plaintiff-Relators estimate that at least 30-40% of HPH's current patients are ineligible for hospice.  In fact, Cutcliffe, the company's own risk manager, has repeatedly told Plaintiff-Relator Numbers that HPH would be in serious trouble if audited.

**(b)     Defendant HPH's Fraudulent Scheme of Eliciting and Back-dating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care**

32.     HPH also uses false revocation and election paperwork to fraudulently revoke legitimate Hospice patients who require expensive palliative hospital care. Hospice requires that the Hospice Defendants bear any costs for palliative care, regardless of whether such care exceeds the standard *per-diem* amount.   The *per-diem* rate paid by the United States and the State of Florida to the Hospice Defendants, however, is generally much less than the actual *per-diem* cost of even a routine hospital stay for palliative treatment.   Unwilling to absorb the high costs of hospital care, HPH fraudulently shifts these costs to the United States through

false revocations.   In order to shift costs, HPH fraudulently "revokes" patients using blank revocation forms obtained at the time of admission.   These patients remain off the Hospice rolls for the duration of their hospitalization in order to fraudulently shift the expensive hospital costs to the United States.   As a result, the United States and Florida  – which have already contracted with HPH to provide the care at a Hospice *per diem* rate – instead pays for the same care at much higher fee-per-service rate under the Medicare Part A hospital benefit.   Once the patient is discharged from the hospital, he or she is fraudulently readmitted using a false election form obtained in the same manner.

33.   HPH   further   shifts   costs   by   fraudulently   backdating   revocation paperwork.   When patients go to the hospital – for palliative care – HPH personnel are told to fraudulently date the counterfeit revocation paperwork for the date of the hospitalization, even if the patient did not sign the revocation paperwork at that time and was never told that his or her hospice benefit was revoked until days later. HPH's practice in is direct violation Title 42, CODE OF FEDERAL REGULATIONS, Section 418.28.   As a result of the scheme, the United States pays a full Medicare fee-per-service rate for care that it has already paid for at the lower hospice *per diem* rate.

34.   The Hospital Defendants participate in HPH's fraud.   The Hospital Defendants have contracts with HPH under which the Hospital Defendants receive

a set "contract rate" for hospice patients who are hospitalized. This rate is lower than the Medicare Part A fee-per-service rates. In other words, the Hospital Defendants get paid more for the same care if a patient revokes Hospice than if he remains on Hospice. Accordingly, the Hospital Defendants also have incentive to – and do – pressure patients to revoke Hospice even though the care required by the patients is palliative.

(c)  **Defendant HPH's Schemes of Double Billing and Billing for Work That Is Never Performed**

35.   HPH fraudulently double-bills the United States and the State of Florida under Hospice for patients who are already being billed to Medicare and Medicaid under the Skilled Nursing Benefit. As a result, Medicare and Medicaid are billed twice for care that should be paid for under either the Skilled Nursing Benefit or Hospice, but not both.

36.   Additionally, it is HPH's practice to fraudulently back-date admission paperwork for patients who have rolled off of skilled care, resulting in false claims for hospice care that was never provided. As set out *infra*, HPH conspires with the SNF Defendants, the ALS Defendants, and the Hospital defendants to admit patients into Hospice as soon as their entitlements under other Medicare and Medicaid benefits are exhausted – in disregard of the well-being of the patient and regardless of his or her actual condition. In some instances, however, HPH gets a referral several days after the patient has exhausted his skilled nursing days. In

such an instance, Defendants fraudulently back-date the patient consent and admission paperwork in order to reflect enrollment in Hospice at a date earlier than the actual date of enrollment. Medicare and Medicaid are billed as though the patient received Hospice care during that period, when the patient did not.

**(d)  Defendants' Illegal Kick-Back Relationship and Referral of Medicare/Medicaid Patients in Exchange for Remuneration**

37.    Defendants violate the law and submit false claims to the United States and the State of Florida by offering and receiving illicit kickbacks in exchange for referral of Medicare and Medicaid patients. Federal and Florida State law prohibit the offering or payment of any remuneration in exchange for referral of patients covered by Medicare and Medicaid. In violation of the Anti-Kickback Statute and the Florida Anti-Kickback Statute, the Hospice Defendants offer and provide free services to patients receiving in-patient hospital care, skilled nursing care, and other Medicare and Medicaid-supported healthcare from JSA, the SNF Defendants, the ALF Defendants, and the Hospital Defendants. In exchange, JSA, the SNF Defendants, the ALF Defendants, and the Hospital Defendants refer those and other Medicare and Medicaid patients to the Hospice Defendants once their eligibility for other benefits is exhausted.

38.    Many of the Hospice Defendants' patients are referred by the SNF Defendants, the ALS Defendants, the Hospital Defendants, or JSA. In order to

gain referrals and ingratiate themselves with these referral sources, Defendants routinely provide services free-of-charge to patients who have not yet elected Hospice and who are receiving medical services under the Skilled Nursing Benefit, the Medicaid custodial care benefit, the Medicare Part A hospital insurance benefit, or Medicare Part B coverage.

39.     The provision of free services is a direct financial benefit provided by the Hospice Defendants to the other Defendants. Were the Hospice Defendants not to provide free services, the other Defendants would be obligated to provide the same service at their own expense or hire another healthcare provider to provide them. As a result, the other Defendants are incentivized to refer Medicare and Medicaid patients to the Hospice Defendants, and do so.

40.     For example, Plaintiff-Relator Numbers has personal knowledge of several instances in which JSA administrator Debbie Torres called then-HPH marketer Connie James regarding a Medicare patient receiving services from JSA. In each instance, JSA advised HPH that such patient was still receiving aggressive curative treatment – paid for by the United States and the State of Florida – and was not ready to elect the Hospice benefit but that the patient would soon exhaust coverage or treatment options. In each instance, in exchange for JSA's referring such patient to HPH, HPH provided free service to the patient before the patient elected Hospice. Because JSA would otherwise have been obligated to provide the

care that was provided by HPH, JSA received a financial benefit from HPH in exchange for referring a Medicare or Medicaid patient.

41.     Likewise, in their long experience at HPH, Plaintiff-Relators have collectively witnessed instances in which each of the SNF Defendants, the ALF Defendants, and the Hospital Defendants received free services from the Hospital Defendants to patients in their care and already receiving Medicare or Medicaid-supported healthcare.     In exchange, each of the other Defendants referred Medicare and Medicaid patients to the Hospice Defendants.

42.     In a recent conversation, Gulfside marketer Connie James confirmed to Plaintiff-Relator Numbers that Gulfside currently provides free service (the Hospice Defendants refer to their practice under the euphemism "private service" – but no one is paying) to 84 patients residing in the facilities operated by the SNF Defendants and ALF Defendants.     James stated that the "private service" arrangements were known by and approved by Gulfside CEO Linda Ward. Specifically, Gulfside currently provides free service to several patients residing in the Royal Oaks ECF.

43.     By and through all of the circumstances described *supra*, Defendants have undermined the noble intention and mission of Hospice, defrauded the United States and the State of Florida, and jeopardized the already overly-strained Medicare and Medicaid programs.

## COUNT ONE – DEFENDANT HPH
## FALSE CLAIMS FOR HOSPICE SERVICES UNDER 31 U.S.C. § 3729

44.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

45.     By and through the fraudulent schemes described herein, Defendant HPH knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –   presented or caused to be presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)     false certifications and/or re-certifications of Hospice patients whom HPH knew did not qualify for Medicare or Medicaid reimbursement and false claims to the United States for hospices services to such patients;

(b)     false revocation and admission paperwork designed to avoid detection of false claims and to get future false claims paid;

(c)     false "back-dated" admissions and false claims to the United States for hospice services HPH never performed;

(d)     false patient records, medical charts, and physician orders indicating fraudulent diagnoses unrelated to patients' actual clinical characteristics intended

27

to create the appearance that non-qualifying patients were terminal, when they were not;

(e)     false claims for Hospice services provided to patients referred by JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants, to whom HPH provided illegal remuneration as proscribed by the Anti-Kickback Statute.

46.     The United States paid the false claims described herein and summarized in paragraph 41 (a)-(e).

47.     By and through the actions described *supra*, HPH knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

48.     HPH's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to HPH by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the United States, and against Defendant HPH, in an amount equal to treble the damages sustained by reason of HPH's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT TWO – DEFENDANT HPH
## FALSE CLAIMS FOR HOSPICE SERVICES UNDER FLA STAT. § 68.082

49.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

50.    By and through the fraudulent schemes described herein, Defendant HPH knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –  presented or caused to be presented to an officer or employee of an agency of the State of Florida false or fraudulent claims for payment or approval and knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by such agency, to wit:

(a)    false certifications and/or re-certifications of Hospice patients whom HPH knew did not qualify for Medicare or Medicaid reimbursement and false claims to the United States for hospice services to such patients;

(b)    false revocation and admission paperwork designed to avoid detection of false claims and to get future false claims paid;

(c)    false "back-dated" admissions and false claims to the State of Florida for hospice services HPH never performed;

(d)    false patient records, medical charts, and physician orders indicating fraudulent diagnoses unrelated to patients' actual clinical characteristics intended

to create the appearance that non-qualifying patients were terminal, when they were not; and

(e)    false claims for Hospice services provided to patients referred by JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants, to whom HPH provided illegal remuneration as proscribed by the Florida Anti-Kickback Statute.

51.    The State of Florida paid the false claims described herein and summarized in paragraph 46(a)-(e).

52.    By and through the actions described *supra*, HPH knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the State of Florida through the Medicaid program and submitted false or misleading information or statements to the Florida Medicaid program for the purpose of being accepted as a Medicaid provider.

53.    HPH's fraudulent actions described herein have resulted in damage to the State of Florida equal to the amount paid or reimbursed to HPH by the State of Florida through Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the State of Florida, and against Defendant HPH, in an amount equal to treble the damages sustained by reason of HPH's conduct, together with civil

penalties as permitted by FLA. STAT. § 68.083, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT THREE – DEFENDANT GULFSIDE
## FALSE CLAIMS FOR HOSPICE SERVICES UNDER 31 U.S.C. § 3729

54. Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

55. By and through the fraudulent schemes described herein, Defendant Gulfside knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit: Gulfside submitted false claims for Hospice services provided to patients referred by SNFs to whom Gulfside provided illegal remuneration as proscribed the Anti-Kickback Statute.

56. The United States paid the false claims described herein.

57. By and through the actions described *supra*, Gulfside knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

58.   Gulfside's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Gulfside by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the United States, and against Defendant Gulfside, in an amount equal to treble the damages sustained by reason of Gulfside's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FOUR – DEFENDANT GULFSIDE
## FALSE CLAIMS FOR HOSPICE SERVICES UNDER FLA STAT. § 68.082

59.   Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

60.   By and through the fraudulent schemes described herein, Defendant Gulfside knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented to an office or employee of an agency of the State of Florida false or fraudulent claims for payment or approval and knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by such agency, to wit:  false claims for Hospice services provided to

patients referred by SNFs to whom Gulfside provided illegal remuneration as proscribed the Florida Anti-Kickback Statute.

61.   The State of Florida paid the false claims described herein.

62.   By and through the actions described *supra*, Gulfside knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the State of Florida through the Medicaid program and submitted false or misleading information or statements to the Florida Medicaid program for the purpose of being accepted as a Medicaid provider.

63.   Gulfside's fraudulent actions described herein have resulted in damage to the State of Florida equal to the amount paid or reimbursed to Gulfside by the State of Florida through Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the State of Florida, and against Defendant Gulfside in an amount equal to treble the damages sustained by reason of Gulfside's conduct, together with civil penalties as permitted by FLA. STAT. § 68.083, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FIVE – DEFENDANT JSA, SNF DEFENDANTS, ALS DEFENDANTS, AND HOSPITAL DEFENDANTS CAUSING FALSE CLAIMS TO BE SUBMITTED FOR HOSPICE SERVICES UNDER 31 U.S.C. § 3729 AND FLA STAT. § 68.082

64.     Plaintiff-Relators adopts and incorporate the previous paragraphs as though fully set forth herein.

65.     By and through the actions described herein, Defendant JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants knowingly caused to be presented to the United States the State of Florida false or fraudulent claims, to wit:  each of these Defendants referred Medicare and Medicaid patients to the Hospice Defendants in exchange for illegal kickbacks as proscribed by the Anti-Kickback Statute and the Florida Anti-Kickback Statute.

66.     JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants each accepted in-kind bribes from the Hospice Defendants – in the form of free healthcare services which would otherwise have been paid for by such Defendants – in exchange for referring Medicare and Medicaid patients to the Hospice Defendants.  JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants, each knew that their fraudulent actions described herein would result in false billing to the United States and the State of Florida for Hospice patients whose referral had been illicitly induced.  As described *supra*, the Hospice Defendants in fact submitted false claims for Hospice services to patients

illegally referred by JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants.

67.   The United States and the State of Florida in fact paid the false claims identified herein.

68.   As a result of the fraudulent conduct of JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants, the United States and the State of Florida have been damages in the amount paid or reimbursed to the Hospice Defendants for the patients referred under Defendants' illegal scheme.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the United States and the State of Florida, and against JSA, the SNF Defendants, the ALS Defendants, and the Hospital Defendants in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and FLA. STAT. § 68.083, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT SIX
## FRADULENT INDUCEMENT BY DEFENDANT HPH FOR PAYMENT OF FALSE CLAIMS OR TO GET FALSE CLAIMS PAID UNDER 31 U.S.C. § 3729 AND FLA STAT. § 68.082

69.   Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

70.   By and through the actions described herein, HPH knowingly presented, or caused to be presented, to the United States the State of Florida false or fraudulent claims, to wit:  HPH fraudulently induced United States and the State of Florida to pay per-patient per-diem fees for patient care that it never intended to provide.

71.   HPH agreed to provide care to patients in return for a per-patient per-diem payment from the United States and the State of Florida through Medicare and Medicaid.  The United States and the State of Florida made it clear that such per-patient per-diem payments were consideration for HPH's agreement to provide ongoing palliative patient care; and HPH's agreement to provide such ongoing palliative care was – in fact – a condition of the per-patient per-diem payments to HPH.

72.   At the time that HPH requested and accepted the per-patient per-diem payments, it intended to avoid the high costs of palliative-care procedures and medications by using false revocation paperwork to temporarily revoke patients' Hospice election in order that such expensive procedures should be billed under regular Medicare A or the Medicaid in-patient hospital benefit, rather than by the Hospice.  To that end, HPH employed the counterfeit paperwork to create the appearance that such patients revoked their Hospice election and on many

occasions fraudulently back-dated such revocations in order to shift the high costs of hospital procedures and prescription medications away from HPH.

73.    Accordingly, the United States and the State of Florida were misled by HPH's material misrepresentation that HPH would provide such palliative care for such patients – an obligation HPH ultimately avoided through fraudulent revocation and back-dating of revocations.  In many instances, after the expensive procedures were completed, the patients were fraudulently re-certified for Hospice.

74.    By and through the actions described *supra*, HPH knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and admission documents and back-dated revocation records and false claims for payment to the United States and the State of Florida related to the per-patient per-diem claims for payment.

75.    HPH's fraudulent actions described herein have resulted in damage to the United States equal to the monthly per-patient payments made to HPH by the United States and the State of Florida through Medicare and Medicaid for all patients whose Hospice election was fraudulently revoked.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the United States and the State of Florida, and against HPH in an amount equal to treble the damages sustained by reason of HPH's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and FLA. STAT. § 68.083,

attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT SEVEN
## CAUSING TO BE PRESENTED FALSE CLAIMS FOR MEDICARE PAYMENT UNDER 31 U.S.C. § 3729 AND FLA. STAT. § 68.082

76.   Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

77.   HPH knowingly presented, or caused to be presented, to officers or employees of the United States and an agency of the State of Florida, false or fraudulent claims for payment or approval, to-wit: by falsifying and backdating revocations in order avoid paying for palliative care and to have such costs paid instead on a fee-per-service basis by Medicare or Medicaid, HPH caused to be presented false claims to the United States and the State of Florida in the form of the claims for payment for such service through Medicare or Medicaid, which should have been borne by HPH and not by the United States.

78.   HPH's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States and the State of Florida through fraudulent revocation of hospice patients in order to avoid paying for palliative treatment, which resulted in fraudulent billing of the United States and the State of Florida at a much higher rate through Medicare, Medicaid, or both.

79.    By and through the actions described *supra*, HPH knowingly made, used, or caused to be made or used, false revocation documents and back-dated revocations regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States or the State of Florida through Medicare or Medicaid to get a false or fraudulent claim paid or approved by the United States or an agency of the State of Florida.

80.    HPH's fraudulent actions described herein have resulted in damage to the United States and the State of Florida equal to the amount paid by the United States and the State of Florida through Medicare and Medicaid for such false or fraudulent claims for payment of services which should have been paid for by HPH.

WHEREFORE, Plaintiff-Relators request entry of judgment in their favor on behalf of the United States and the State of Florida, and against HPH, in an amount equal to treble the damages sustained by reason of HPH's fraudulent conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and FLA. STAT. § 68.083, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT EIGHT
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(2) AND FLA. STAT. § 68.083

81.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

82.    Defendants knowingly presented, or caused to be presented, to officers and employees of the United States and the State of Florida, false or fraudulent claims for payment or approval, to-wit: Defendants knowingly submitted and caused to be submitted false claims for Hospice patients referred in exchange for illegal kickbacks

83.    The United States and the State of Florida paid Defendants for such false claims.

84.    Defendants, in concert with their principals, agents, employees, and other institutions did agree to submit such false claims to the United States and the State of Florida.

85.    Defendants and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States and the State of Florida by submitting false claims for payment to the United States and the State of Florida through Medicare and Medicaid.

86.    Defendants' fraudulent actions, together with the fraudulent actions of their principals, agents and employees, have resulted in damage to the United States and the State of Florida equal to the amount paid by the United States and the State of Florida to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and the State of Florida and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 21 U.S.C. § 3729 and FLA. STAT. § 68.083, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

Date: April __19__, 2010.

_____
ALAN F. WAGNER

OF COUNSEL:
WAGNER VAUGHAN MCLAUGHLIN
601 Bayshore Blvd., Suite 901
Tampa, Florida 33606
Tel: (813) 225-4000
alanwagner@wagnerlaw.com

_____
HENRY J. FROHSIN (*Pro Hac Vice*)
JAMES F. BARGER, JR. (*Pro Hac Vice*)
J. ELLIOTT WALTHALL (*Pro Hac Vice*)

OF COUNSEL:
FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel: (205) 933-4006
henry@frohsinbarger.com
jim@frohsinbarger.com
elliott@frohsinbarger.com

Attorneys for Plaintiff-Relators
Heather Jo Numbers and
Gregory Scott Davis

**RELATORS DEMANDS A TRIAL BY STRUCK JURY**

## CERTIFICATE OF SERVICE

On this the _____ day of April, 2010, Plaintiff-Relators hereby certify that in

compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the *Qui*

*Tam* Complaint has been executed as follows:

**By Registered Mail/Return Receipt to:**

A. Brian Albritton, U.S.A.
United States Attorney's Office
400 N. Tampa Street, Suite 3200
Tampa, FL 33602-4798

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Mr. Bill McCollum, A.G.
Office of the Attorney General
State of Florida
The Capitol  PL-01
Tallahassee, FL 32399-1050

Ms. Alex Sink, CFO
Florida Dept. of Financial Services
200 East Gaines Street
Tallahassee, FL 32399-4228

OF COUNSEL